UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

GUANGYU ZHAO,                                  :
                                               :
                              Plaintiff,        :        08 Civ. 8872   (PAC) (MHD)
                                               :
            - against -                         :        <u>MEMORANDUM</u>
                                               :        <u>OPINION & ORDER</u>
TIME, INC.,                                     :
                                               :
                              Defendant.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 24, 2010

HONORABLE PAUL A. CROTTY, United States District Judge:

<u>Pro se</u> Plaintiff Guangyu Zhao ("Zhao") brings this action against her former employer, Defendant Time, Inc. ("Time"), asserting claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e <u>et seq.</u>, the New York State Human Rights Law ("NYHRL"), N.Y. Exec. Law § 290 <u>et seq.</u>, and the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8-101 <u>et seq.</u>  Zhao claims that Time discriminated against her in the terms and conditions of her employment, exposed her to a hostile work environment, and ultimately terminated her based on her sex, race and nation origin.  For these alleged wrongs, Zhao seeks back pay, compensatory damages, reinstatement and various other relief.

After she was fired, Zhao filed a charge of discrimination against Time with the United States Equal Employment Opportunity Commission ("EEOC").  The EEOC issued Zhao a right-to-sue letter on May 30, 2008, and she commenced this action on October 16, 2008.  The Court referred the general pretrial matters and dispositive motions in the case to Magistrate Judge Michael Dolinger on November 11, 2008.  On October 9, 2009, after the conclusion of discovery, Time moved for summary judgment on all of Zhao's claims.  Time maintains that Zhao was fired for poor performance, not because of

her sex, race or national origin, and that the workplace events and conditions Zhao relies on do not amount to adverse employment actions or show a hostile work environment.

On May 26, 2010, Magistrate Judge Dolinger issued a ninety-page Report and Recommendation ("R&R") recommending that the Court grant Time's motion for summary judgment. Magistrate Judge Dolinger concluded that: (1) Zhao's discriminatory termination claim fails because, even assuming Zhao made out a prima facie case of discrimination, she did not offer sufficient evidence for a reasonable trier of fact to conclude that Time's non-discriminatory reason for terminating her – poor job performance – is pretextual; (2) Zhao's discrimination claim based on the terms and conditions of her employment before she was fired fails because Zhao has not shown that she was subject to any adverse employment actions before she was terminated and, in any event, failed to show that Time's actions were motivated by her race, sex or national origin; and (3) Zhao's hostile work environment claim fails because the evidence does not provide a basis for a reasonable trier of fact to conclude that Zhao's work environment was hostile or abusive or that her treatment was motivated by discriminatory animus.

After three extensions of time, Zhao filed timely objections of 17 pages, plus 6 pages of exhibits on August 5, 2010. The Court has reviewed the R&R and Zhao's objections. For the reasons that follow, the Court adopts the R&R in substantial part. More specifically, the Court adopts Magistrate Judge Dolinger's analysis regarding the Title VII and NYSHRL claims and his conclusion that Time is entitled to summary judgment on all of Zhao's claims. In assessing Zhao's claims under the NYCHRL, it was incorrect to apply Title VII's standards. But application of the correct NYCHRL standards does not change the result: Zhao's claims fail. Zhao was fired for bona fide reasons, such as refusing to follow her supervisors' directions, failing to complete

assignments, missing meetings, neglecting her duties and being generally a rude and substandard employee. While Zhao maintains that she was an effective employee, and none of her employer's explanations are credible, her sole evidence of discrimination is the fact she is a female of Chinese origin.  Gender, race and national origin by themselves, or even with Zhao's say-so, do not establish that she was fired because of her gender, race or national origin.  Time's motion for summary judgment is accordingly GRANTED.

**Background**

**I. Facts**[1]

Zhao, who is an Asian woman and citizen of the People's Republic of China, was employed by Time from July 31, 2006 until she was fired on October 31, 2007.  She was initially hired as a consultant by Amanda Hanes ("Hanes"), the director of Time's Web Operations and Support Group.  Throughout her tenure at Time, Zhao worked in the Application Support Group, which is a subpart of the Web Operations and Support Group.  When she was first hired, Zhao was one of three employees in the Application Support Group.  Hanes added another employee to the group in October, 2006, when she hired Matthew Miritello ("Miritello") as a senior systems developer.  The ranks of the Application Support Group had risen to five when Hanes hired Zhao as a full-time systems engineer on December 11, 2006.  While the Application Support Group did not have a manager for the first eight months of Zhao's employment, Hanes promoted Miritello to manager in March, 2007.

Zhao's work at Time centered around Verity, a search technology that Time used in connection with the various websites it owns and operates.  Before Miritello became her supervisor, Zhao participated in meetings relating to Verity application-support

---

[1] The facts are taken from the R&R and, where noted, from the parties' submissions.

issues, which allowed her to understand her clients' needs and to resolve problems more effectively.  Zhao was not, however, required to participate in meetings that did not relate to her assignments.  At some point during Zhao's employment, Time decided to transition off Verity to a new search technology called Endeca.  After Time made the decision to transition off Verity, Zhao was required to learn about Endeca and to use her knowledge of Verity to ensure a successful transition to Endeca.

Zhoa's responsibilities at Time also included "cross-training" her colleagues.  But according to Zhao, she was not required to cross-train her colleagues to perform her job until after Miritello became her supervisor in March, 2007.  Zhao also claims that Miritello did not require a white male employee named John Neilson ("Neilson") to cross-train other employees.  According to Hanes, cross-training was vital because it enabled employees to perform more than one job, which in turn protected Time against "dangerous knowledge or support gap[s]" in the event an employee was not at work.  Until Miritello became the Application Support Group manager, however, cross-training was not feasible because the group had so few employees.  Hanes explains that when Miritello became manager, there were more employees in the group and "we were prepared to accelerate cross training for the unit."  (Hanes. Aff. ¶ 14.)  Hanes denies that Neilson was not required to cross-train his fellow employees, and points out that she listed "cross training" as a goal in Neilson's February, 2007 performance review. (Performance Review, Hanes Aff., Ex. E.)

For the four months after she became a full-time employee and before Miritello became her supervisor (December, 2006 - March, 2007), Zhao's job performance was deemed "satisfactory or better" and she did not receive any negative feed back from her supervisors or complaints from her colleagues.  In a performance evaluation for this period, Hanes commended Zhao for her hard work, independence and ability to meet

deadlines.  Hanes noted that Zhao needed to learn more about Endeca and improve her ability to communicate technical issues to lay persons, but generally had nothing but praise for Zhao.

Things changed, however, when Miritello became manager of the Application Support Group in March, 2007.  According to Zhao, Miritello "basically terminated all female employees, but hired all males."  In her affidavit, Zhao explains that when she started as a full-time employee, an Indian woman named Sara Ghasletwala ("Ghasletwala") was the only other women in the Application Support Group. Ghasletwala was a contractor, and Zhao asserts – without any support – that Miritello was responsible for the decision not to renew Ghasletwala's contract once it expired. Miritello replaced Ghasletwala with three male contractors, which left Zhao as the lone woman in the Application Support Group.

Contrary to Zhao's version of events, Hanes testified that she and Miritello were both involved in the May, 2007 decision not to renew Ghasletwala's contract, and that the decision was made because Ghasletwala had trouble working independently.  Moreover, Miritello helped Ghasletwala obtain a full-time position in web production at one of Time's magazines.  According to Hanes, the position in web production better suited Ghasletwala's skill set.

Zhao and Miritello, her supervisor, exchanged a series of emails relating to a People.com project on August 15, 2007.  Zhao responded to an email forwarded by the Miritello by stating, "Please ask clarence to open a rms ticket to use for future communication.  I do not understand why he always emailed you and you forward to me. It is weird since it is not good for communications, it should not be encouraged." Miritello wrote back, "How is this going?  Do you need any additional information from them?"  Zhao's response to her supervisor's query was, "PLEASE ASK THEM TO

OPEN A RMS TICKET AS A PLACE HOLDER FOR FUTURE COMMINCATION. THAT IS ALWAYS THE FIRST STEP IN THE PROCESS.  It is my fault if I did not make this clear before."  Miritello replied, "So you haven't checked to see if what they've sent is complete?"  Zhao ended the email exchange by stating, "Further future communication is a sure thing.  Any other questions?"

Zhao offers this interpretation: Miritello was trying to prevent her from communicating directly with clients, which in turn hindered her ability to perform as an employee.  She used capital letters to "reiterate and emphasize my proposal which needed to be addressed in a timely fashion."  Miritello saw things differently, however, and later in the day he met with Zhao to discuss the emails – which he considered "inappropriate and rude" – as well as complaints he had received from other employees about Zhao's lack of respect for her colleagues.  What exactly happened during the meeting is disputed, but the meeting clearly did not go well.  According to Miritello, he asked Zhao "to be mindful of her tone in emails and to willingly cooperate with her colleagues."  Zhao claims that Miritello "accused her of being harsh to him," and "asked [her] to be nice to him so that he would address and discuss [her] business proposal."  Zhao says that when she told Miritello "that he could not accuse [her] without evidence," he started yelling, "yes, I can, because I am your boss."  According to Miritello, the meeting came to an end when Zhao stormed out of his office, but Zhao recalls the meeting ending after she suggested that they take time to calm down and resume the discussion later.

Miritello considered Zhao's tone in the emails, and her behavior during the meeting, to be grounds enough for termination.  After discussing Zhao's behavior with human resources, however, Miritello decided to give Zhao a few weeks to "cool off" before resuming their discussion about her performance and insubordination.

In early September, 2007, Zhao asked Miritello about taking three weeks of paid vacation.  According to Zhao, Miritello refused to grant her request unless she completed a "knowledge transfer" to a white male contractor named Matthew Merkelson ("Merkelson").  Miritello testified that he met with Zhao on September 6, 2007 to discuss her vacation and insubordination.  He told Zhao that "if she wanted to take an extended vacation, her technology platform would need coverage during her absence and, therefore, she would need to cross-train her colleague Matthew Merkelson."  Zhao, however, refused to cross-train "any of her colleagues because she did not want anyone else to learn her job."  Zhao concedes that she refused to comply with Miritello's request to "do a cross-training to each everything I knew about my work to Matthew Merkelson." (Zhao Aff.  3 ¶ B7.)  Instead, she proposed a more limited approach: to "teach Matthew Merkelson everything he needed to cover me when I was on vacation."  (Id.)  Zhao also told Miritello that there were detailed documents explaining how to do her job, and that he could call her if a problem arose when she was on vacation.  (Id.)

Miritello reported Zhao's refusal to cross-train Merkelson to Hanes, who met with Zhao to explain the importance of cross-training.  In Zhao's words, she told Hanes that "I would teach Matthew Merkelson everything he needed to cover me when I was on vacation.  I did not agree to teach everything I knew about my work to Matthew Merkelson."  (Id. at 3 ¶ B8.)  Exasperated by Zhao's unwillingness to cross-train Merkelson, Hanes and Miritello spoke with Dennis Brito ("Brito") in Human Resources. Brito suggested that Miritello meet with Zhao to make clear that her refusal to participate in cross-training was unacceptable and could lead to disciplinary action.  Brito, however, agrees with Miritello that Zhao's continued insubordination and refusal to cross-train Merkelson were further grounds for termination.  (Brito Aff. ¶ 6; Miritello Aff. ¶ 8.)

Miritello followed Brito's suggestion and scheduled a meeting with Zhao and Hanes for September 26, 2007.  According to Zhao, she was unaware that the Hanes was to attend the meeting; she asserts that "[t]he 1 on 1 was supposed to have only Miritello and me as attendances."  (Zhao Aff. at 3 ¶ B9.)  Time, however, submitted an electronic calendar invitation that Miritello sent to Zhao on September 25, 2007, which lists Hanes and Zhao as required attendees.  But regardless of whether Hanes was to attend the meeting, Hanes and Miritello both testified that Zhao did not show up at the September 26th meeting.  Miritello scheduled another meeting for September 28, 2007, which Zhao also failed to attend.  In her affidavit, Zhao concedes that the two meetings never took place, but she speculates that "[i]t could be the case that I went to Miritello's office at the exact meeting time, but Miritello was not in his office."  (Zhao Afff. At 4 ¶ B9.)

In his affidavit, Miritello states that after Zhao failed to show up at the September 28th meeting, he contacted her by instant messenger and she claimed to have forgotten the meeting and "gone to lunch."  (Miritello Aff. ¶ 9.)  But in an email Miritello sent to human resources regarding Zhao in late October, 2007, he indicates that Zhao used her "forgot" and "went to lunch" excuse after the September 26th meeting, as opposed to the meeting scheduled for October 28th.  (Email dated October 29, 2007, Miritello Aff., Ex. G.)  Miritello copied his instant message exchange with Zhao in the email, but as Zhao points out, the instant messages are not in chronological order.  (Id.)  Despite Zhao's unwillingness to cross-train Merkelson, at some point Miritello approved her request for three weeks of vacation, but in October, 2007, Zhao apparently informed Miritello that her vacation would actually be for a month.

Paul da Silveira ("da Silveira") worked in the Project Management Group at Time and was responsible for managing the transition from Verity to Endeca.  In late September, 2007, he asked Zhao to provide him with a list of all systems and databases

using Verity.  According to da Silveira, Zhao's response to his request was incomplete. On September 28, 2007, da Silveira sent Zhao an email expressing his dissatisfaction and outlining the work she needed to do by October 1, 2007 in order to provide a complete response to his request.  Zhao wrote back, "[y]ou have to give me a week to . . . update the document with accurate info.  I already told you this last time I sent you the doc. When I asked you if you wanted me to start the monitoring then to speed up thing[s]. You said nothing.  I need a week from now."

Given Zhao's refusal to compile the information he requested in a timely fashion, da Silveira spoke with Miritello and voiced his concerns about Zhao's participation in the Endeca transition project.  After speaking with da Silveira, Mititello forwarded the email exchange between da Silveira and Zhao to Hanes who was shocked by Zhao's claimed inability to complete the task by October 1.  October 1 passed without Zhao's compliance with da Silveira's request, and on October 2, 2007, Miritello sent an email to Hanes that reads, "Paul [da Silveira] continues to try to get the stats from her for Verity but she will not provide what he's asking for because she doesn't feel it's necessary (I do feel it's necessary).  When he pressed her to still provide the stats, she told him no and that he should get more resources to do it."  According to Zhao, she did not complete the assignment because she was waiting to hear from Miritello and da Silveira regarding her concern that the requested statistics might be misleading.

Da Silveira held a series of daily meetings with the Endeca project team in order to manage the significant amount of work involved in transitioning from Verity to Endeca.  In her affidavit, Zhao claims da Silveira required her to attend the meetings even though they did not implicate her work, but he did not require Matt Eng ("Eng") to attend the meetings.  Eng was not required to attend the meetings, according to Zhao, despite the fact that she and Eng "were involved in the project in [a] similar way."

9

Without any prior notice, Zhao failed to attend an Endeca project team meeting held at 10:00 a.m. on October 1, 2007.  Zhao claims she was home sick that morning, but in an email she sent to Miritello at 10:18 a.m. the morning of the meeting, Zhao wrote that she would be in at 1 p.m. and did not offer a reason for her late arrival.  Zhao arrived at work at 2:00 p.m. and either asked or told da Silveira to move subsequent Endeca project meetings to the afternoon in order to accommodate her commute from New Jersey.  According to Miritello, when da Silveira told Zhao that the meetings could not be moved, Zhao said that she would no longer attend Endeca project meetings.

On October 5, 2007, Miritello met with Zhao to discuss her performance issues and to warn her that she would be put on formal written warning if she did not change her behavior.  Miritello told Zhao that he expected her to attend all morning project meetings, perform assigned tasks, create a training document, spend three hours a week cross-training Merkelson, and supply comprehensive weekly written reports of her activities.  Zhao replied that she would only attend meetings she considered necessary, that she did not know what tasks Miritello was referring to, that the training document already existed, and that she disagreed with having to write weekly reports.

After Miritello warned Zhao about the prospect of a formal warning, Zhao attended two Endeca project team meetings concerning Golf.com on October 8 and 9, 2007.  According to da Silveira, Zhao disrupted the October 9 meeting by repeatedly raising an objection to a decision that had been made prior to the meeting.  Despite being told that the meeting was not the appropriate place to voice her objection, Zhao "insisted on continuing the discussion, took a stand and created a scene."  (da Silveira Aff. ¶ 7.)  In her affidavit, Zhao does not challenge da Silveira's description of her behavior at the October 9 meeting.  Instead, she focuses on explaining why her objection was valid. (Zhao Aff.  5 ¶ B10(4).)

On October 10, 2007, da Silveira sent Zhao an email and asked her not attend a meeting regarding Golf.com scheduled for the following day.  When Zhao went to the meeting to ask da Silveira why he did not want her to attend, she discovered that "Miritello and Matthew Merkelson replaced me to attend the meeting."  (Id.)  Da Silveira told Zhao that the reason he had asked her not to attend the meeting was because he needed her to work on another assignment. When Zhao explained that she had completed the assignment, da Silveira let her attend the meeting.

At some point after Zhao disrupted the October 9 Golf.com meeting, Miritello, Hanes and Brito decided to place Zhao on "formal written warning."  On October 18, 2007, Miritello met with Zhao and gave her a letter ("warning letter") which reads:

> This is to confirm our conversation where I put you on a final written warning for failure to execute your responsibilities adequately.
>
> The most recent examples, where I need to see sustained improvement, are the following:
>
> 1. Accepting responsibility for and delivering on all tasks assigned to you by myself and, for the Endeca Project, Paul da Silveira.
> 2. Attending all required Endeca Project and Application Support meetings.
> 3. Writing up a comprehensive training document covering all aspects of tasks required for Verity Support.
> 4. From 10/22 to 11/9, spend 3 hours each week training Matthew Merkelson using the Verity Support Training document and/or reviewing current Verity tickets.
> 5. Deliver to my email inbox, by the end of the day each Monday beginning 10/22, a comprehensive weekly report in writing of your activities, highlighting any issues with projects, from the previous week.
>
> If I do not see immediate improvement in these areas within the next 30 days, further action will be taken up to and including termination.

(Final Written Warning, Zhao Aff., Ex. B.)  After Zhao left for the day, Hanes noticed that Zhao had left the warning letter face up on her desk where anyone walking by could see it.  Hanes told Miritello about this seemingly defiant behavior and Miritello moved

the letter to a less obvious location on Zhao's desk.  (Hanes Aff. ¶ 19; Email dated

10/19/2007, Hanes Aff., Ex. L.)

      A day after Miritello gave Zhao the warning letter, Miritello sent an email to

Holly Antuik ("Antuik") in Human Resources describing his meeting with Zhao and

recounting how she left the warning letter out on her desk in an apparent act of defiance.

(Email dated 10/19/2007, Hanes Aff., Ex. L.)  Miritello explained that when he met with

Zhao, she refused to accept any criticism of her behavior "and instead saw the

conversation as an opportunity to debate my expectations and question my role once

again."  (Id.)  He wrote that "[a]t this point, I've come to the conclusion that she's quite

int[r]actable and that this warning will have little or no effect. . . . I'm concerned . . . that

her future intent is simply malicious. . . . I feel that something needs to be done as soon as

possible."  (Id.)

      In her affidavit, Zhao lists the requirements set forth in the warning letter and

states that she satisfied – or made an earnest attempt to satisfy – all of them.  (Zhao Aff.

at 6-7 ¶B15.)  According to Miritello, Zhao "did not complete *any* of the[] tasks within

the first two weeks following her written warning."  (Miritello Aff. ¶ 15.)

      On October 22, 2007, Zhao sent Miritello an email with the subject line "status

report for the week of 11/15/2007."  (Email dated 10/22/2007, Hanes Aff., Ex. O.)  The

email provides one-line descriptions of different task, such as "fixed bugs for time.com

endeca incremental" and "did a case for pii 45844."  (Id.)  Miritello wrote back, "I asked

you to send me a comprehensive report of your activities, highlighting any issued with

projects from the previous week.  What you sent be below is completely unsatisfactory.

Please expand on these properly asap."  (Email dated October 23, 2007 at 11:29 a.m.,

Hanes Aff., Ex. O.)  Zhao responded by adding "Completed. No issue," "No issue" and

"see RMS ticket for detail" below the same one-line descriptions she had provided in her

initial email.  (Email dated October 23, 2007 at 4:39 p.m., Hanes Aff., Ex. O.)  According to Zhao, since Miritello did not complain about her response, she assumed that it met his expectations.  Zhao explains that had she known "Miritello was not satisfied with my reports, I would [have] modif[ied them] until he was satisfied."  (Zhao Aff. at 7 ¶ B15(5).)

On October 26, 2007, Miritello sent Zhao an email asking whether she had composed the Verity training document or met with Merkelson to discuss Verity.  In her reply, Zhao wrote that she was working on the training document, but could not train Merkelson before the document was complete.  She added, "I assumed that you already spoke with Matthew about the training and allocated his time for the trainings.  In case you have not got a chance to do so, could you please get them done before I propose a training meeting to Matthew?"  Miritello forwarded the email to Hanes, and in an email to Antiuk sent a few days later, he observed that Zhao and Merkelson "are both on my team and there is absolutely no reason why this task should have lingered an entire week based on her assumption."

Zhao's duties as a systems engineer involved being "on call" to answer urgent support service requests for seven days each month.  When she was on call, Zhao had to be available 24 hours a day, return all calls to her cell phone within 15 minutes, and be able to access a computer within 45 minutes of receiving a call.  On October 29, 2007, Zhao was on-call but unreachable for over an hour because her cell phone was off.  On the same day, Zhao sent Miritello another sparsely worded weekly status report.  After receiving the status report, and learning that Zhao's cell phone was off when she was on call, Miritello sent Antiuk an email detailing what he saw as Zhao's numerous incidents of poor performance between August 15, 2007 and October 29, 2007.  At the end of the

email, Miritello wrote, "Please let me know if after reading this and considering it in its totality, if we can proceed with her termination."

Time fired Zhao on October 31, 2007.  Both Miritello and Hanes were involved in the decision to end Zhao's employment, (Miritello Aff. ¶ 17; Hanes Aff. ¶ 22), but Hanes' approval "was required for the termination to occur."  (Hanes Aff. ¶ 22.)  As Zhao reads the warning letter, it "clearly said that I had 30 days to improve."  (Zhao Aff. at 6 ¶ B14.)  According to Zhao, "Miritello disregarded my accomplishments and terminated by employment long before the 30 day period ended to prevent me from taking my vacation."  (Id.)  Zhao asserts that, "I was terminated by Miritello because of my sex (female) my race (Asian) and my national origin (Chinese).  I was treated unequally to the Caucasian, male workers.  The conditions of my employment were altered once Miritello arrived and he wanted me to fail so that he could hire more male workers."  (Id. at 1 ¶ A8, at 8 ¶ B17.)  Zhao also posits that Miritello filled her position with male employees, but does not elucidate how she knows this.  (Id.  at 2 ¶ B5.)

In her affidavit, Hanes explains that Miritello hired a number of female and Asian employees both before and after Zhao was terminated.  She lists the names of two women (one of "Indian Origin") and six non-Caucasian men hired by Miritello, but at least five (possibly six) of the employees were hired after Zhao filed this lawsuit.  According to Hanes, Miritello and Brito, Zhao's sex, race and national origin had nothing to do with the decision to end her employment.  (Hanes Aff. ¶ 8; Miritello Aff. ¶ 17; Brito Aff. ¶ 8.) Instead, Zhao was fired because of her "repeated and serious performance issues, including her insubordination, missed meetings and inability to work with her colleagues."  (Miritello Aff. ¶ 17; Hanes Aff ¶ 22; Brito Aff. ¶ 8.)  Other than Zhao's conclusory argument, there is no evidence at all that any of Time's conduct was due to Zhao's gender, race or national origin.

14

## II. Magistrate Judge Dolinger's R&R[2]

Since Zhao is prosecuting this action pro se, Magistrate Judge Dolinger construed the Complaint liberally.  He concluded that Zhao is asserting disparate treatment claims based on her termination and the terms and conditions of her employment prior to her termination.  Magistrate Judge Dolinger also read the Complaint to assert a hostile work environment claim.  Zhao brings these claims under Title VII, the NYHRL and the NYCHRL.  (Compl. at 1.)  In analyzing Zhao's claims under these three different laws, Magistrate Judge Dolinger applied the standards applicable to Title VII claims.  This was entirely proper insofar as the analysis applies to Zhao's claims under Title VII and the NYHRL.  See Torres v. Pisano, 116 F.3d 625, 629 n.1 (2d Cir. 1997) ("We have repeatedly noted that claims brought under New York State's Human Rights law are analytically identical to claims brought under Title VII.")  But as more fully explained in section V of this opinion, "claims brought under the NYCHRL [must] be evaluated separately from counterpart claims under Title VII."  Desphande v. Medisys Health Network, Inc., No. 07-CV-375(KAM)(VVP), 2010 WL 1539745, at *22 (E.D.N.Y. April 16, 2010).

---

[2] At the outset of the R&R, Magistrate Judge Dolinger noted that Time failed to provide Zhao with a "Notice to Pro Se Litigant Who Opposes a Summary Judgment" as required by Local Rule 56.2.  (R&R at 5-13.)  As a result, Zhao did not file a counter-statement to Time's Rule 56.1 statement of undisputed facts.  Zhao did, however, respond to Time's evidence in her affidavit, which is organized to specifically respond to each paragraph of the three affidavits Time submitted in support of its motion.  Moreover, Zhao brought Time's failure to provide her with a Rule 56.2 notice to Magistrate Judge Dolinger's attention, which further shows that she understood her burden in opposing the motion for summary judgment.  In light of the care with which Zhao responded to Time's evidence, Magistrate Judge Dolinger found no reason to believe that Zhao would have submitted additional evidence had she received a Rule 56.2 notice.  Since Zhao understood the nature and consequences of summary judgment, and was not prejudiced by Time's failure to provide her with a Rule 56.2 notice, Magistrate Judge Dolinger held that denial of Time's motion for summary judgment for failure to comply with Rule 56.2's notice requirement is not required.  (Id. at 11.)  The R&R states that "if plaintiff believes that she has been prejudiced in some way by not receiving the notification required by Local Civil Rule 56.2, she may voice her objection to the District Judge."  (Id.)  Zhao's objections do not raise this issue, and the Court agrees with Magistrate Judge Dolinger that, under the circumstances, Time's failure to provide Zhao with a Rule 56.2 notice is excusable and denial of the motion for summary judgment is not required.  See Forsyth v. Fed'n Emp't & Guidance Serv., 409 F.3d 565, 571 (2d Cir. 2005) (failure to provide Rule 56.2 notice does not required denial of motion for summary judgment when pro se litigant "understood the nature and consequences of summary judgment.").

Even though there are differences between the standards under which NYCHRL and Title VII claims are judged, the analytical framework is the same.  See Leibowitz v. Cornell Univ., 584 F.3d 487, 498 n.1 (2d Cir. 2009) ("gender discrimination claims brought pursuant to the . . . NYCHRL are analyzed under the Title VII framework.").  As noted by Magistrate Judge Dolinger, the Second Circuit has "determined that a plaintiff's discrimination claim under both the NYSHRL and the NYCHRL are subject to the burden shifting-analysis applied to discrimination claims under Title VII."  Speigel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010); see also Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007).  To survive a motion for summary judgment, "a Title VII plaintiff must satisfy a three part burden-shifting test."  Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005) (quoting Mario v. P & C Food Markets, Inc., 313 F.3d 758, 767 (2d Cir. 2002).

"In the first step of this framework, the employee bears the burden of producing evidence sufficient to support a *prima facie* case of discrimination."  Baguer v. Spanish Broad. Sys., Inc., No. 04 Civ. 8393(RJS), 2010 WL 2813632, at *6 (S.D.N.Y. July 12, 2010) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  The Supreme Court "has used the adjective 'minimal' to describe the burden of establishing a *prima facie* case of discrimination in violation of Title VII."  Sassaman v. Gamache, 566 F.3d 307, 312 (2d Cir. 2009) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993)).  The plaintiff must show that "(1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment action; and (4) the decision or action occurred under the circumstances giving rise to an inference of discrimination based on his membership in a protected class."  Dawson, 398 F.3d at 217 (quoting Mario, 313 F.3d at 767).

If the plaintiff makes out a *prima facie* case, "the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for the employment action." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).  A defendant accused of discrimination "must clearly set forth, through the introduction of admissible evidence, the reasons for the [employment action]." Baguer, 2010 WL 2813632, at *6 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981)).  If the defendant proffers a lawful reason for the adverse employment action, "the presumption of discrimination created by the prima facie case drops out of the analysis, and the defendant 'will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonable support a finding of prohibited discrimination.'" Dawson, 398 F.3d at 216 (quoting Mario, 313 F.3d 767).  To avoid summary judgment, the plaintiff must "come forward with evidence that the defendant's proffered, non-discriminatory reason is mere pretext for actual discrimination.  The plaintiff must 'produce not simply "some" evidence, but "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action."'" Weinstock., 224 F.3d at 42 (internal brackets omitted) (quoting VanZant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (quoting Woroski v. Nashua Corp., 31 F.3d 105, 110 (2d Cir. 1994)).

Magistrate Judge Dolinger turned first to Zhao's discriminatory termination claim.  (R&R at 48-64.)  He pointed out that as an Asian woman from China who was fired, Zhao plainly satisfied the first (protected class member) and third (adverse employment action) elements of her *prima facie* case.  (R&R at 54.)  As for the remaining two elements, Magistrate Judge assumed –without deciding – that Zhao had established that her termination took place under circumstances giving rise to an

inference of unlawful discrimination and that she was competent to perform her job. (Id. at 54-56.) He made this assumption since Time replaced Ghasletwala and (perhaps) Zhao with white men, and because Zhao, at least initially, received favorable performance reviews.

But even assuming Zhao made out a *prima facie* case – and that is a generous assumption with respect to Zhao's competence to perform her job – Magistrate Judge Dolinger concluded that Time had rebutted the presumption of discrimination by proffering a non-discriminatory reason for Zhao's termination and that Zhao failed to come forward with evidence showing that Time's reason is pretextual. (Id. at 57-64.) Time claims that Zhao was terminated because of her "repeated and serious performance issues, including insubordination, missed meetings and inability to work with colleagues." (Def's. Mem. in Supp. at 10.) Construing the record in the light most favorable to Zhao, Magistrate Judge Dolinger found that "the undisputed evidence indicates that, at a minimum, plaintiff missed several meetings, refused to comply with a directive to cross-train her colleagues, failed to complete an assignment from Paul da Silveira that was due October 1, and was unreachable by cell phone for an hour during her on-call rotation after being placed on 'final warning', all of which was known to plaintiff's supervisors prior to her termination and cited by defendant as being among the grounds for terminating her." (R&R at 58.) These facts, according to Magistrate Judge Dolinger, sufficiently rebutted Zhao's *prima facie* case, and so the burden shifted to Zhao to raise a triable issue of fact as to whether discriminatory animus was a motivating factor behind Time's decision to end her employment. (R&R at 59.) Magistrate Judge Dolinger found Zhao's attempt to carry her burden woefully lacking.

Zhao speculates that Time's evaluation of her work was the product of a conspiracy, headed by Miritello, to find a reason to terminate her and that the conspiracy

18

was fueled by animus based on her sex, race and national origin.  (Zhao Aff. at 4 ¶ B10.)

As Magistrate Judge Dolinger explained, however, Zhao "offers no concrete evidence . . .

to suggest the existence of such a conspiracy."  (R&R at 59.)  In her affidavit, Zhao

asserts that her sex, race and national origin played a role in Time's decision to fire her.

(Zhao Aff. at 8 ¶ B17.)  But this assertion is nothing but *ipse dixit* and Magistrate Judge

Dolinger accordingly gave it "no weight."  (R&R at 60.)

      In light of the well documented evidence of Zhao's deficient performance as an

employee, Magistrate Judge Dolinger rejected Zhao's contention that a reasonable juror

could find that Time acted with discriminatory animus because she and Ghasletwala were

replaced with white males.  Magistrate Judge Dolinger explained that while Miritello and

Hanes decided not to renew Glasletwala's contract, Miritello helped Ghasletwala obtain

more suitable employment in a different department of Time.  Magistrate Judge Dolinger

also explained that although – during Zhao's brief tenure as a full-time employee –

Miritello filled the few available positions in the Application Support Group with white

males, over time he hired a number of female, non-white and non-American employees.

(R&R at 63.)  According to Magistrate Judge Dolinger, given the absence of any

evidence as to the sex, race and national origin of other applicants,  Zhao's "limited

snapshot" of Miritello's hiring decisions over a seven-month period "at best creates only

a very weak inference of discrimination."  (Id. at 64.)  Magistrate Judge Dolinger

accordingly held that "plaintiff has simply failed to provide sufficient evidence from

which a rational trier of fact could conclude that her termination was motivated, in while

or in part, by any impermissible animus." (Id.)

      Magistrate Judge Dolinger turned next to Zhao's claim that Time discriminated

against her in setting the terms and conditions of her employment before she was fired.

(R&R at 64-81.)  As explained, to establish a *prima facie* case of discrimination the

plaintiff must show that she "suffered an adverse employment action."  Dawson, 398

F.3d at 21.  "An adverse employment action is a 'materially adverse change in the terms

and conditions of employment."  Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir.

2008) (quoting Sanders v. N.Y. City Human Res. Admin, 361, F.3d 749, 755 (2d Cir.

2004)).  Examples of materially adverse changes in an employee's terms and conditions

of employment "include termination of employment, a demotion evidenced by decreased

wage or salary, a less distinguished title, significantly diminished material

responsibilities, or other indices unique to a particular situation."  Potter, 548 F.3d at 78

(quoting Sanders, 361 F.3d at 755).  At bottom, to be materially adverse, the challenged

action must affect the plaintiff's employment is a way that is "both detrimental and

substantial."  Reddy v. Salvation Army,  591 F. Supp. 2d 406, 425 (S.D.N.Y. 2008).

Construing her papers as broadly as possible, Magistrate Judge Dolinger

determined that Zhao's pre-termination disparate treatment claim is based on her

allegations involving mistreatment by Miritello.  (R&R at 65.)  Time argues that none of

the pre-termination employment actions Zhao complains of amount to "materially

adverse employment actions" and, in any event, Zhao has not offered sufficient evidence

that its treatment of her was motivated by discriminatory animus.  (Def's Mem. in Supp.

at 13-16.)  Magistrate Judge Dolinger agreed on both counts.  He explained that to the

extent Zhao claims Miritello was rude or harsh to her or dismissive of her ideas, such

treatment does not amount to a materially adverse employment action.  (R&R at 71.)  As

for Zhao's claim that Miritello required her to attend unnecessary meetings, excluded her

from meetings and interfered with her ability to directly communicate with clients,

Magistrate Judge Dolinger concluded that these incidents amount to nothing more than

alterations of Zhao's job responsibilities, which do not constitute materially adverse

employment actions.  (Id. at 72.)  If Zhao is claiming that these incidents show that

Miritello obstructed her ability to do her job successfully, Magistrate Judge Dolinger held that "the minor interference with her work that plaintiff alleged in this case does not itself constitute a material impairment of the terms or conditions of her employment and thus is not actionable as an independent disparate-treatment claim." (Id. at 74.)

Zhao's principal complaint seems to be that Miritello prevented her from taking three weeks of paid vacation by requiring her to fully cross-train Merkelson, as well as by putting her on formal warning and then terminating her before the end of what she considered to be a 30-day probationary period. (Id. at 65-66, 74.) According to Magistrate Judge Dolinger, stripping Zhao of her vacation time would constitute a materially adverse change in the terms and conditions of her employment. (Id. at 74.) And Magistrate Judge Dolinger assumed that imposing new conditions on Zhao's ability to take vacation time would likewise constitute an adverse employment action. Magistrate Judge Dolinger concluded, however, that Time did neither of these things.

With respect to Zhao's claim based on Miritello's insistence that she cross-train Merkelson before taking her vacation, Magistrate Judge Dolinger explained that Miritello – at most – controlled the timing of Zhao's vacation. (R&R at 75.) He noted that there is no evidence that Miritello threatened to nullify Zhao's accrued vacation. (Id.) Instead, Miritello's unrefuted testimony is that he wanted to ensure that other employees would be able to cover Zhao's position when she took her vacation. (Id.)  As explained by Magistrate Judge Dolinger, Courts in this circuit have held that an unfavorable work schedule does not constitute an adverse employment action. See e.g., Nicholls v. Brookdale Univ. Hosp. & Med. Cntr., No. 03-CV-6233, 2005 WL 1521239, at * 31 (E.D.N.Y. June 22, 2005), aff'd, 205 F. App'x 858 (2d Cir. 2006).

Moreover, since Zhao eventually obtained approval for her vacation despite refusing to cross-train Merkelson, Magistrate Judge Dolinger concluded that no

reasonable juror could find that Time actually denied Zhao vacation time by insisting that she cross-train Merkelson.  (R&R at 76-77.)  Indeed, cross-training was not simply a vacation related requirement; rather, the undisputed evidence shows that Time pursued cross-training as a goal for Zhao, and other employees, outside the context of vacation planning.  (Id. at 77-78.)  Since Zhao was not denied vacation time by Miritello's request that she first cross-train Merkelson, Magistrate Judge Dolinger held that "the undisputed facts regarding the cross-training requirement and plaintiff's request to take vacation do not demonstrate that plaintiff was subjected to an adverse employment action."  (Id. at 78.)

Even if Zhao suffered an adverse employment action, Magistrate Judge Dolinger explained that she "has failed to show that the cross-training requirement or restriction of her vacation scheduling took place under circumstances that would allow for an inference of discrimination."   (Id.)  The only putative evidence of discrimination offered by Zhao is her own testimony that Neilson (a white male employee) was not required to cross-train anyone before he took vacation in the summer of 2007.  (Id.)  But Zhao's testimony, according to Magistrate Judge Dolinger, "is unhelpful for several reasons."  (Id.)  First, Zhao does not indicate how she has personal knowledge that Neilson was exempt from the cross-training requirement.  Second, Zhao has not shown that she and Neilson were similarly situated.  Even assuming Zhao and Neilson held similar positions at Time, Zhao does not state how much vacation time Neilson requested.  Since "it seems entirely possible and reasonable that the requirements for approval of a three-week or one-month vacation might be different from the requirements for scheduling a shorter vacation," (Id. at 79), Magistrate Judge Dolinger concluded that Zhao's testimony regarding Neilson to create, at best, "only a very weak inference of discrimination."  (Id.)  And this very weak inference of discrimination becomes even weaker when viewed in light of the evidence

that Nielson was, as a general matter, required to train his colleagues, and the fact that Zhao's vacation request was eventually approved despite her refusal to fully cross-train Merkelson.  (Id.)

As for Zhao's contention that she was stripped of vacation time because Time fired her before she went on vacation, Magistrate Judge Dolinger held that even assuming Zhao's termination cost her vacation benefits, this loss "does not give rise to a disparate-treatment claim separate from the claim arising out of her termination."  (Id.)  He reasoned that while Zhao's loss of vacation time might have rendered her termination "particularly harsh, any claim arising out of this nullification of vacation benefits as an incident of her termination would seem to turn on the same facts as underlie her claim for discriminatory termination."  (Id.)  Since Zhao's discriminatory termination claim fails because she has not shown that she was fired based on her sex, race or national origin, her claim based on lost vacation time due to her termination also fails.  (Id.)

Lastly, Magistrate Judge Dolinger took up Zhao's hostile work environment claim.  (R&R at 81-89.)  A plaintiff seeking to establish "a Title VII hostile work environment claim must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 79 (2d. Cir. 2010) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  Title VII does not "set forth a 'general civility code for the American workplace,'" Kaytor v. Elec. Boat Corp., 609 F.3d 537, 546 (2d Cir. 2010) (quoting Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)), and in order to "survive a motion for summary judgment, a plaintiff claiming that he or she was the victim of an unlawful hostile work environment must elicit evidence from which a reasonable trier of fact could conclude . . . that the

workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his or her work environment."  Mack v. Otis Elveator Co., 326 F.3d 116, 122 (2d Cir. 2003) (brackets omitted) (quoting Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 436  (2d Cir. 1999)).

     In determining whether the plaintiff has carried this burden, "[t]he relevant inquiry focuses on both objective and subjective hostility: 'A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively perceived it to be so.'"  Pucino v. Verizon Commc'ns, Inc., __ F.3d __, No. 09-1306-cv, 2010 WL 319433, at *5 (2d Cir. Aug. 13, 2010) (quoting Brenna v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999).  "Courts review the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  McGullam, 609 F.3d at 79 (quoting Harris, 510 U.S. at 23).

     Since the Complaint only mentions a "hostile work environment" in passing, Magistrate Judge Dolinger inferred that Zhao intends to base her hostile work environment claim on the same allegations as her pre-termination disparate treatment claim – namely, her allegations of mistreatment by Miritello.   (R&R at 81.)  Time argues that Zhao has failed to demonstrate that she was subject to a work environment that a reasonable person would find hostile or abusive.  (Def's Mem. in Supp. at 15-16.)  Time also maintains that there is no evidence that its treatment of Zhao was motivated by discriminatory animus.  (Id.)  Magistrate Judge Dolinger agreed, without reservation.

     Construing the record most favorably to Zhao, Magistrate Judge Dolinger explained that a reasonable trier of fact could find that Miritello "yelled" at Zhao; made isolated statements could be construed as accusatory, authoritarian or condescending;

stifled Zhao's unsolicited suggestions on as many as four occasions; shifted Zhao's

responsibilities away from strategic decision making to a more supporting role;

monitored Zhao more closely than Hanes had in the past; may have required Zhao to

attend some inconvenient meetings which did not require her attendance; and may not

have utilized Zhao's abilities to their full extent.  (R&R at 86-88.)  Magistrate Judge

Dolinger correctly concluded that none of these actions, whether viewed separately or in

combination, amount to an objectively hostile work environment. He held that

"[c]onsidered in its totality, this record simply does not provide any basis whatsoever for

a trier of fact to conclude that Ms. Zhao was subjected to a work environment that a

reasonable person would find 'hostile or abusive' either in nature or persistence."  (Id. at

88.)

   Magistrate Judge Dolinger found Zhao's proof of Time's alleged discriminatory

motive even more deficient.  He explained that Zhao provides no evidence of

discriminatory animus with respect to most of the incidents she cites in support of her

hostile work environment claim.  (Id.)  According to Magistrate Judge Dolinger, the only

evidence that might "arguably create an inference of discrimination" is Zhao's assertion

that Neilson, (a white male) was not required to cross-train anyone before taking

vacation, and her claim that Matt Eng (an Asian male) was not required to attend daily

meetings.  (Id. at 89.)  For the reasons already explained, Magistrate Judge Dolinger

found Zhao's reliance on Miritello's alleged treatment of Neilson to be unpersuasive.  As

for Eng, Magistrate Judge Dolinger noted Zhao "fails to explain her basis of knowledge

of Matt Eng's responsibilities or to proffer any evidence that they were similarly

situated."  (Id.)  Even if Zhao's testimony that Eng was exempt from attending daily

meetings is credited, Magistrate Judge Dolinger found the testimony to be "plainly

insufficient to demonstrate that the entire course of her allegedly hostile treatment while

she was under Mr. Miritello's supervision was because of her sex, race, or national

origin."  (Id.)  In the final analysis, Magistrate Judge Dolinger labeled Zhao's hostile

work environment claim "glaringly deficient," and held that "a reasonable trier of fact

simply could not infer from the evidentiary record that her treatment was motivated by

any discriminatory animus or that the action about which plaintiff complaint were

sufficiently serious or pervasive to support a hostile-work-environment claim."  (Id.)

**Discussion**

### III. Standard of Review

A district court may "accept, reject, or modify, in whole or in part, the findings or

recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  When a timely

objection has been made to the recommendations of the magistrate judge, the court is

obligated to review the contested issues de novo.  Hynes v. Squillace, 143 F.3d 653, 656

(2d Cir. 1998).  The Court, however, "may adopt those portions of the Report [and

Recommendation] to which no objections have been made and which are not facially

erroneous."  La Torres v. Walker, 216 F. Supp. 2d 157, 159 (S.D.N.Y 2000).

### IV. Zhao's Objections

Zhao's objections, while lengthy, are devoid of merit.  Zhao's efforts are largely

devoted to reiterating the conclusory assertions she made in her affidavit in opposition to

Time's motion for summary judgment, but repetition is no substitute for substance.  She

insists that Miritello was out to get her, and that he duped Hanes into agreeing with his

unfounded accusations of deficient performance.  In addition to pulling one over on

Hanes, Miritello recruited da Silveira to assist him in his vendetta against Zhao.

Everyone at Time was wrong; Zhao was a great employee and there was no reason to

discipline or fire her.  But even if this was true – and based on the evidence of record, it

most certainly was not – Zhao still fails to show that Miritello's, Hanes' or da Silveira's actions were in any way related to her race, gender or national origin.

At the beginning of her objections, Zhao explains that she objects to Magistrate Judge Dolinger's conclusion that she failed to prove that Time's proffered reason for her termination is pretextual.  (Obj at 1).  She asserts, contrary to the evidence of record and without any support, that Miritello was "the major decision maker for firing Ms. Ghasletwala."  (Id. at 2.)  Ghasletwala could have been a good employee, according to Zhao, but Miritello did not train her properly.  In support, Zhao claims that she heard Miritello talking to Ghasletwala about his children "when he was supposed to give trainings to Ms. Ghasletwala, but the atmosphere was cold because Ms. Ghasletwala was not interested in the topic."  (Id. at 3.)  Three months after Ghasletwala was "terminated," Miritello hired Jeremy Chou, an Asian-American male.  This, according to Zhao, shows that Miritello "replaced Ms. Ghasletwala with Mr. Chou."  (Id.)  But the evidence shows that Ghasletwala was not "terminated" by Miritello; instead, Miritello and Hanes jointly decided not to renew her contract.  And after Ghasletwala's contract was not renewed, Miritello helped her get a job at Time in another division. Moreover, Zhao does not explain how she knows that Ghasletwala was "not interested in" Miritello's children, and in any event, it would be rather strange for Miritello to chat about his family with a woman he intended to fire for discriminatory reasons.  Most importantly, even if Miritello replaced Ghasletwala with Chou, this fact alone does not show that he discriminated against Ghasletwala based on her race, gender or national origin.  It certainly does not show that Miritello discriminated against Zhao on based on her race, gender or national origin.

According to Zhao, before Miritello became manager she "used to take the ownership . . . of [Verity related] projects and worked directly with our clients from

analysis, to design implementation."  (Id.)  Zhao asserts that she and Neilson were similarly situated, and that in August, 2007 Miritello pulled her away from a project, but "did not interfere with Mr. Ne[i]lson's work."  (Id.)  Zhao claims that "[w]hat Mr. Miritello did was a discriminatory action against Asian woman for their taking decision making and leadership roles."  (Id.)  The only evidence that Zhao and Neilson were similarly situated is, however, the fact that they were both supervised by Miritello. Indeed, if Zhao's assertions in her objections are accepted, she and Nielson were most likely not similarly situated.  According to Zhao, she was an expert in Verity, (Id. at 1), but "Mr. Neilson's expertise was not with Verity search."  (Id. at 3); see Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 63 (2d Cir. 1997) ("To be 'similarly situated,' the individuals with whom . . . [the plaintiff] compares herself must be similarly situated in all material respects."); Thomas v. Istar Fin, Inc., 438 F. Supp.2d 348, 386 n. 7 (S.D.N.Y. 2006) (to be similarly situated employees "must share a sufficient amount of significant employment characteristics, including similar educational background, performance, and work duties.")  But even if Zhao and Neilson were similarly situated, the fact Miritello pulled her off a project does not offer sufficient evidence for a reasonable fact finder to conclude that the he acted with discriminatory intent.  The evidence of Zhao's deficient performance is too overwhelming, and the evidence of discrimination far too sparse.

During the four months before Miritello became Zhao's manager, Hanes "praised and encouraged" Zhao's "assertive professional behaviors to handle difficult situations." (Obj. at 4.)  According to Zhao, after she sent her capitalized email to Miritello on August 15, 2007, Miritello "accused me of being harsh to him."  (Id.)  But Zhao claims "I was not harsh to him.  I was doing my job and at all times acted professionally."  (Id.) The difference between how Hanes (a woman) and Miritello (a man) perceived Zhao's behavior reveals "Mr. Miritello's discriminatory attitude toward women with their

assertive behavior in the workplace." (Id.) Zhao, however, ignores the fact that Hanes'
perception was of her was during the period before Miritello became manager of the
Application Support Group. Indeed, Hanes agrees whole heartedly with Miritello's
assessment of Zhao's well documented impudence during the period after he became
manager. Hanes, in fact, was part of the group that decided to place Zhao on formal
written warning, and was an integral part of Time's ultimate decision to fire Zhao.
Moreover, the emails Zhao sent to Miritello on August 15, 2007 speak for themselves.
Zhao's response to Miritello's cordial inquiry was wholly inappropriate, and if Miritello
did call Zhao "harsh," the criticism was well deserved. There is no evidence that
Miritello's actions were motivated by a belief that women should not be assertive.
Rather, his actions were most likely motivated by a belief that employees of any race,
gender or citizenship should not be rude and should follow their supervisor's instructions.

　　　Zhao claims that the Miritello's testimony that her behavior in connection with
the August 15, 2007 email exchange was grounds for termination points "to
discriminatory animus . . . [because] I had no performance incidents in this incident."
(Id. at 5.) Telling your supervisor what to do in an aggressive tone and in capitalized
letters is, however, a "performance incident." While Zhao points out that during the
thirteen months before August, 2007 she had a "solid satisfactory performance history,"
this does not change the indisputable fact that Zhao sent the inappropriate emails to
Miritello, who was her supervisor.

　　　Zhao goes on for pages trying to explain why she was justified in refusing to
cross-train Merkelson before she took time off. (Obj. at 5-7.) The important fact is not,
however, whether Zhao believed cross-training was appropriate, but rather Zhao's
concession that she flat-out refused to cross-train Merkelson in the manner requested by
Miritello and Hanes. (Id. at 6-7.) Zhao claims that there "two different kinds of

knowledge transfer," a "100% knowledge transfer" and an "all knowledge he needed to cover me for the work while I was on vacation" transfer.  (Id. at 6.)  Miritello's failure to make this distinction when he complained about Zhao to human resources shows, according to Zhao, "how Mr. Miritello manipulated the meaning of things to undermine my performance."  There is no evidence that anyone at Time other than Zhao was aware of or countenanced this more limited form of cross-training.  Instead, it appears that what Zhao proffers as an alternative form of cross-training is simply the form of cross-train she unilaterally decided should be required for Miritello to approve her three-week vacation – a vacation which Miritello ultimately approved despite Zhao's continued refusal to cross-train Merkelson.

Zhao reiterates that Neilson was not required to cross-train anyone before taking vacation, and adds that Miritello did not perform cross-training before he took vacation time.  (Id. at 7.)  As explained by Magistrate Judge Dolinger, there is no evidence as to the length of Nelison's vacation, which makes Zhao's comparison inapt.  Moreover, the evidence shows that Neilson was, as a general matter, expected to cross-train his colleagues.  As for Miritello not performing cross-training, Zhao is unwilling to recognize the simple fact that Miritello was her superior at Time.  He was not, therefore, similarly situated with Zhao, and whether he cross-trained anyone is irrelevant.

According to Zhao, "[i]n the probation period . . . I did not refuse to give a full knowledge transfer anymore."  (Id.)  Since Miritello terminated Zhao before the end of the 30 days the warning letter gave her to improve her performance, Zhao claims that he "terminated me to not allow the training to be completed although only two more weeks were needed to complete the trainings."  (Id.)  Zhao maintains that "[t]he fact that Mr. Miritello did not allow the knowledge transfer to be completed was so contradictive with his previous claim on how important it was to do a full knowledge transfer to cover the

work, that his sincerity when making his previous claim is unworthy of credence." (<u>Id.</u>)
But Zhao's "early" termination does not show that Miritello did not think cross-training
was important; rather, it is reflection on the inadequacy of Zhao's performance even after
she received the warning letter.  During the "probation period," Zhao submitted two
inadequate status reports, was insubordinate when asked to file complete status reports,
dragged her feet on cross-training Merkelson, and left her cell phone off when she was
on-call.  The warning letter was not a contract; Time was not bound to wait until the end
of the thirty-day period to terminate Zhao.  Moreover, while Miritello inquired into
whether Zhao could be fired after she failed to abide by the terms of the warning letter,
Miritello was only one of at least two people who decided to end Zhao's employment.

Before Miritello became manager of the Application Support Group, Zhao and da
Silveira worked well together.  (<u>Id.</u>)  According to Zhao, when she and da Silveira had a
"big disagreement" over a project, they worked it out amicably and da Silveira did not
"make any complaint of me to Ms. Hanes who was my manager at that time and I did not
complain about him either."  (<u>Id.</u>)  Zhao claims that once Miritello became manager, and
da Silveira "got to know" him, "they shared negative opinions about me . . . [and] they
quickly worked together to undermine my performance."  (<u>Id.</u> at 8.)  Miritello and da
Silveira formed an "alliance" and provided Hanes with "untrue information" about
Zhao's performance, which caused Hanes to "form[] a wrong idea about my
performance."  (<u>Id.</u> at 9.)  To support this conjecture, Zhao rambles on that she was
justified in refusing to compile the Verity statistics da Silveira requested by October 1,
2007.  Zhao "thought a week was proper, not too long and not too short" and da Silveira
"simply did not agree with me on my estimation of time with no reason."  (<u>Id.</u> at 8.)
According to Zhao, her behavior at the October 9th Golf.com meeting was justified
because "she thought it was important to have . . . [the technical lead] fully understand

31

the problem of the non-modular design and the benefits of the modular design before he made the decision."  (Id.)  But what Zhao claims is "concrete evidence" that Miritello and da Silveira were out to get her, and that they led Hanes astray by providing misinformation, is nothing but pages of irrelevant and unsworn assertions.  As explained by Magistrate Judge Dolinger, there is no evidence of a conspiracy to see that Zhao was fired.  More importantly, there is no evidence of a conspiracy motivated by Zhao's gender, race or national origin to see that she was fired.

The only evidence of discrimination proffered by Zhao in connection with Miritello and da Silveira's alleged "alliance" to undermine her performance is Zhao's assertion that Miritello forced her to "attend daily meetings that I had no tasks involved," but did not force Eng (an Asian-American male) "to attend daily meetings that he had no tasks involved."  (Id. at 12.)   She also claims that da Silveira discriminated against her and Sugar Bade (an Indian male) because da Silveira organized a party for a co-worker "but did not invite Mr. Bade and I."  When the co-worker notified da Silveira about this alleged slight, da Silveira "invited us to the party the day the party was held."  (Id.)  But other than her assertion that that she and Eng "were both not working on this project full time," Zhao does not offer any evidence that she and Eng were similarly situated.  (Id.)  But even if Zhao and Eng were similarly situated, the fact he was not required to attend some daily meetings does not provide sufficient evidence for a reasonable trier of fact to conclude that Miritello required Zhao to attend allegedly unnecessary meetings because of her race, gender or national origin.  Zhao's unsworn assertion that da Silveira did not invite her and Bade to a co-workers party until the last minute is unhelpful because there is no evidence of the race, gender or national origin of the people da Silveira did invite to the party.

With regard to the meetings on September 26 and 28, 2007, Zhao claims that "I never ignored any 1 on 1." (<u>Id.</u>)  According to Zhao' she forgot the September 26th meeting, but Time "did not have any evidence that I did not show up at the" meeting scheduled for September 28.  (<u>Id.</u> at 13.)  Zhao reasons that since "Mr. Miritello did not provide any evidence showing that he was in his office at 12:30 p.m. on September 28 . . . no reasonable factfinder could reach a conclusion that I failed to attend Sept 28 meeting from defendant's testimony and evidence." (<u>Id.</u>)  Time did, however, submit evidence that Zhao failed to attend the September 28 meeting, and that Miritello was in his office at the scheduled time; namely, Miritello's and Hanes' testimony based on personal knowledge that Zhao failed to attend the September 28 meeting.  (Miritello Aff. ¶ 9; Hanes Aff. ¶ 17.)  Indeed, no reasonable fact finder could conclude that Zhao did show up at the meeting since Zhao does not claim that she in fact went to the meeting.  Instead, Zhao speculates that "it could be possible that I showed up at 12:30pm sharp at Mr. Miritello's office, but he was not in his office."  (Obj. at 13.)

In his affidavit, Miritello states that Zhao used her "forgot and went to lunch" excuse after the September 28 meeting, (Miritello Aff. ¶ 9), but in a late October, 2007 email to human resources, Miritello indicates that Zhao used the excuse in an instant message she sent him after the September 26 meeting.  Miritello copied his instant message exchange with Zhao in the email, but the messages are not in chronological order.  (Email dated October 29, 2007, Miritello Aff., Ex. G.)  It is clear from the instant messages copied in the email that Zhao used her "forgot and went to lunch" excuse after the September 26 meeting, but this is irrelevant.  And while Zhao claims that the instant messages being out of chronological order is "concrete evidence showing that Miritello again manipulated the facts," (Obj. at 13), the order of the instant messages shows nothing of the sort.  It is unclear why the three lines of instant messages are not in

chronological order, but if Miritello wanted to "manipulate[] the facts" he would have changed or deleted the times on the instant messages, not  simply copied messages out of order.  In any event, the order of the instant messages has no effect on their content.  As copied in Miritello's email, the instant messages read: "Miritelm (12:11:38 PM): are we meeting now? Grace99time (12:47:02 PM): sorry that I forgot so that I went to lunch. Talk to you at one on one on Friday. Miritelm (12:46:21 PM): ok."  (Email dated October 29, 2007, Miritello Aff., Ex. G.)

According to Zhao, all of the events which occurred prior to the day she received the warning letter, "did not lead to termination but only led to the formal performance warning.  It was what happened in the probation period that directly caused the termination."  (Obj. at 13.)  Zhao argues that Magistrate Judge Dolinger's analysis of her discriminatory termination claim is flawed because "3 out of 4 of the performance issues he cited did not exist anymore in the probation period."  (Id.)  Zhao is simply wrong. Time's October 18, 2007 warning letter did not wipe Zhao's employment slate clean, deleting all recollection and recordation of Zhao's deficient performance over the previous months.  On the contrary, the warning letter was a manifestation of Zhao's poor performance during seven months after Miritello became her manager in March, 2007. Magistrate Judge Dolinger was correct to consider Zhao's performance throughout her tenure at Time in concluding that Time has proffered a legitimate reason for terminating Zhao.

Zhao claims that during the "probation period," Miritello did a number of "improper things to terminate me."  (Id. at 14.)  Miritello, according to Zhao, "defamed my character by saying to HR and Ms. Hanes that 'her future intent is simply malicious." (Id.)  Zhao claims that she did not do anything "malicious," but even if this is true, it is irrelevant.  Miritello did not accuse Zhao of acting maliciously; his email to human

resources reads, "I'm concerned at this point that her future intent is simply malicious." (Email dated 10/19/2007, Hanes Aff., Ex. L.) Zhao also claims that Miritello "lied by telling HR that I did not complete *any* tasks [set forth in the warning letter] . . . and used it as the reason to terminate me although I completed many tasks." (Id.) But there is no evidence that Miritello told human resources that Zhao did not complete "any" of the tasks the warning letter directed her to complete, instead he made that assertion in his affidavit. (Miritello Aff. ¶ 15.) In his October 19, 2007 email to human resources, Miritello simply set forth the tasks Zhao did not complete, or made only the most minimal of efforts to complete, during the period after she received the warning letter. (Email dated October 29, 2007, Miritello Aff., Ex. G.) And while Zhao claims she completed or tried to complete the tasks in the warning letter, the evidence is to the contrary.

Zhao contends that she was "surprised" to learn that Miritello was not satisfied by her October 22, 2007 "status report." (Obj. at 14.) She claims that Miritello did not make his expectations clear. (Id. at 15.) But the warning letter states that Zhao must, "[d]eliver to my email inbox, by the end of the day each Monday beginning 10/22, a comprehensive weekly report in writing of your activities, highlighting any issues with projects, from the previous week." (Final Written Warning, Zhao Aff., Ex. B.) No reasonable person would consider Zhao's one line descriptions in her status report to be "comprehensive." Moreover, after Zhao sent her initial status report, Miritello wrote back, "I asked you to send me a comprehensive report of your activities, highlighting any issued with projects from the previous week. What you sent be below is completely unsatisfactory. Please expand on these properly asap." (Email dated October 23, 2007 at 11:29 a.m., Hanes Aff., Ex. O.) If Miritello's expectations were not clear from the warning letter, they were made clear by this response. Zhao's response (another report

with the same one-line descriptions, adding only "Completed. No issue," "No issue" and "see RMS ticket for detail") was nothing short of insubordinate.  (Email dated October 23, 2007 at 4:39 p.m., Hanes Aff., Ex. O.)

Zhao maintains that Miritello "altered the terms and conditions set forth in the formal warning letter about the probation by increasing the requirement of performance and shortening the length of the probation to cause me to fail the probation."  (Obj. at 14.) The warning letter states: "If I do not see immediate improvement in these areas within the next 30 days, further action will be taken up to and including termination." (Final Written Warning, Zhao Aff., Ex. B.)  According to Zhao, since "Miritello terminated me after only 14 days into the probation," he shortened the time within which she was "to completing everything mentioned in the formal warning letter [to] within 14 days."  (OBJ at 14.)  But as noted, the warning letter was not a contract; Time was not bound to give Zhao a full 30 days to change her behavior and complete the tasks in the letter. Moreover, while Zhao insists – without any factual support – that "Mr. Miritello was the major decision maker in terminating me," (Id. at 16), the undisputed evidence shows that Hanes' approval was required for Zhao to be terminated.  Furthermore, the warning letter demands "immediate improvement," but the evidence shows that Zhao gave no indication that she intended to improve her behavior.  During the first two weeks after Zhao received the warning letter, she left the warning letter out on her desk in an apparent act of defiance, submitted at least one (likely two) deficient status reports, had not cross-trained Merkelson as requested and left her cell phone off when she was on-call.  Given this record of insubordinate conduct and inadequate performance, Time was not obligated to wait any further.  Instead of immediate improvement, Zhao showed continuing manifestly unsatisfactory behavior.

Zhao takes issue with Magistrate Judge Dolinger's conclusion that the fact Miritello replaced Ghasletwala and (possibly) Zhao with white males "at best creates only a very weak inference of discrimination" because of the limited time frame in which Miritello's hiring decisions were made.  (R&R at 64.)  Zhao "disagree[s] because during the seven-month period, Mr. Miritello did many personnel decisions, including 2 firings and 3 hirings."  (Obj at 15.)  Presumably, Zhao is referring to Miritello "firing" her and Ghasletwala.  But, as repeatedly explained, the evidence shows that Ghasletwala was not "fired" by Miritello; instead, Miritello and Hanes decided not to renew Ghasletwala's contract and afterwards Miritello helped her obtain another position at Time.  And again, Miritello did not fire Zhao on his own; Hanes's approval was needed for the termination to occur.  In any event, the time frame Zhao offers of Miritello's personnel decisions is indeed limited, and in light of the near absence of any other evidence of discrimination, Magistrate Judge Dolinger was correct to conclude Zhao has not shown that Miritello's actions were motivated by discriminatory animus.

Finally, Zhao argues that "although Ms. Hanes was involved in the decision making in terminating me, she lacked first-hand knowledge on my performance and she did not verify things with me but believed Mr. Miritello's input about my work performance and made her decision based on Mr. Miritello's input."  (Id. at 16.)  According to Zhao, "[t]he concrete evidence mentioned before in this document showed how Ms. Hanes' opinion was influenced by Mr. Miritello's untrue input."  (Id.)  The "concrete evidence" shows nothing of the sort.  Rather, the evidence shows that Zhao refused to follow directions, was rude and disruptive, failed to complete assignments, missed meetings, was unreachable when she was on-call and generally believed that her view of how things should be done at Time trumped her supervisor's view.  This evidence was available to Hanes when she agreed with Miritello that Zhao should be

terminated.  Moreover, even if Miritello did deceive Hanes, the evidence of record is wholly insufficient for a reasonable tirer of fact to conclude that he did so because of Zhao's gender, race or national origin.

Zhao provides scant, if any, evidence of discrimination.  Instead, her case is bottomed on a logical fallacy: Zhao is an Asian woman and citizen of China who was fired, so Zhao must have been fired because she is an Asian woman and citizen of China.  But, of course, the logic does not follow. Zhao has not submitted sufficient evidence for a rational trier of fact to conclude that any of Time's actions were motivated by discriminatory animus, Weinstock, 224 F.3d at 42, and her objections are without merit.

**V. The NYCHRL**

With respect to Zhao's claims under the NYCHRL, the Second Circuit recently explained that while NYCHRL "claims have typically been treated as co-extensive with state and federal counterparts . . . the New York City Council has rejected such equivalence." Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 279 (2d Cir. 2009) The Local Civil Rights Restoration Act of 2005 ("Restoration Act"), N.Y.C. Local law No. 85 (2005), "amended the City HRL  in a variety of ways, including confirming the legislative intent to abolish 'parallelism' between the City HRL and the federal and state anti-discrimination law." Id.[3]  The text of and legislative history to the Restoration Act "represent a desire that the City HRL meld the broadest vision of social justice with the strongest law enforcement deterrent," Williams v. N.Y. City Housing Auth., 61 A.D.3d 62, 68 (N.Y. App. Div. 1st Dep't 2009), and the standards applicable to Title VII and the NYHRL are merely "a *floor* below which the City's Human Rights law cannot fall."

---

[3] As amended by Section 7 of the Restoration Act, N.Y. City Admin. Code § 8-130 provides: "The provisions of this title shall be construed liberally for the accomplishment of the uniquely broad and remedial purpose thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed."

Loeffler, 582 F.3d at 279 (quoting Restoration Act § 1).  But the practical effect of the NYCHRL's broad view of social justice – or in other words, just how far the "floor" has been raised – remains unclear.  See Wilson v. N.Y.P Holdings, Inc., No. 05 Civ. 10355(LTS)(DFE), 2009 WL 873206, at *29 (S.D.N.Y. Mar. 31, 2009) (noting that "the precise contours of the amended [NYCHRL] and its analytical overlap with the familiar Title VII analysis remain unclear.")

It is clear, however, that NYCHRL claims must be "evaluated separately from counterpart claims brought under Title VII," Desphande, 201 WL 1539745, at *22, and that the "analysis [is] more stringent than called for under [Title VII or the NYSHRL]." Williams, 61 A.D.3d at 65; see Loeffler, 582 F.3d at 279 ("claims under the City HRL must be given an independent liberal analysis." (internal quotation marks omitted)); see also Kolevovic v. ABM Indus. Inc., 361 F. App'x 246, 248 (2d Cir. 2010) ("under the Restoration Act and Loeffler, the NYCHRL claim should have been evaluated separately from its federal and state counterpart claims.").  Courts have held that to prevail on a NYCHRL disparate treatment claim, the "[p]laintiff must establish 'by a preponderance of the evidence that she has been treated less well than other employees' due to unlawful discrimination."  Kaur v. N.Y. City Health and Hosps. Corp., 688 F. Supp. 2d 317, 340 (S.D.N.Y. 2010) (quoting Williams, 61 A.D.3d at 78); see Bernard v. J.P. Morgan Chase Bank N.A., No. 08 Civ. 4784(THK), 2010 WL 423102, at *9 (S.D.N.Y. Feb. 5, 2010).

Under the NYCHRL, "it is error to evaluate . . . [a hostile work environment] claim under the 'severe or pervasive' standard applicable to Title VII hostile work environment claims."  Kaur, 688 F. Supp. 2d at 340.  "[Q]uestions of 'severity' and 'pervasiveness' are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability."  Williams, 61 A.D.3d at 38.  But while "less egregious conduct than required under Title VII may support a hostile work environment

claim under the NYCHRL," <u>Panzarino v. Deloitte & Touche LLP</u>, No. 05 Civ. 8502(BJS)(RLE), 2009 WL 3539685, at *9 (S.D.N.Y. Oct. 29, 2009), "the broader purposes of the NYCHRL do not connote an intention that the law operate as a general civility code." <u>Kaur</u>, 688 F. Supp. 2d at 340 (quoting <u>Williams</u>, 61 A.D.3d at 40.)

Applying the NYCHRL's more liberal standards, Zhao's disparate treatment and hostile work environment claims still fail. There is no evidence from which a reasonable trier of fact could conclude that Zhao's treatment at Time was in any way motivated by her gender, race or national origin. <u>See</u> <u>Bernard</u>, 2010 WL 423102, at * 9 ("notwithstanding the enactment of the Restoration Act, and the requirement of an independent analysis, courts still analyze NYCHRL claims or race and gender discrimination under the same framework as Title VII claims.") No actions or conduct by Miritello, Hanes, da Silveira or anyone else at Time shows a discriminatory animus. Since there is no evidence that Zhao was "treated less well than other employees due to unlawful discrimination," <u>Kaur</u>, 688 F. Supp. 2d at 340, her NYCHRL disparate treatment claims are devoid of any merit.

Magistrate Judge Dolinger found Zhao's hostile work environment claim to be "glaringly deficient" under Title VII's "severe or pervasive" standard. The claim is equally deficient under the NYCHRL. While the NYCHRL requires "less egregious conduct" than Title VII, <u>Panzarino</u>, 2009 WL 3539685, at *9, Zhao has not shown that she was subjected to conduct that was "egregious," "hostile," or abusive." An employer's request that its employee perform her assigned tasks in a competent manner cannot amount to a hostile work environment for purposes of the NYCHRL. And in any event, there is no evidence that Time acted with discriminatory animus.

## Conclusion

For the foregoing reasons, Time's motion for summary judgment on all of Zhao's

claims is GRANTED and the case is DISMISSED. The Clerk of the Court is directed to

close this matter.

Dated: New York, New York
August 24, 2010

SO ORDERED

PAUL A. CROTTY
United States District Judge

Copies To:    Honorable Michael Dolinger
              United States Magistrate Judge

              Guangyu Zhao
              1833 Mandell Ct.
              San Jose, CA 95131

              Guangyu Zhao
              East 9-1-10, Xin Yuan Li
              Chao Yang District
              Beijing, P.R. China 10002

              Andrew Bruce Lachow
              Time Inc. Law Department
              1271 Avenue of the Americas
              New York, NY 10020